*Lagerstedt v. Top of the Hill Crew, Inc.*, No. 399-6-14 Wncv (Tomasi, J., Dec. 3, 2015).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Washington Unit | CIVIL DIVISION<br>Docket No. 399-6-14 Wncv |
| Christopher Lagerstedt,<br>    Plaintiff<br><br>v.<br><br>Top of the Hill Crew, Inc.,<br>    Defendant | |

## Opinion and Order

This matter came for trial before the Court on October 15, 2015. Both parties appeared and offered evidence. Plaintiff Christopher Lagerstedt was represented by Edward Miller, Jr., Esq.; Defendant Top of the Hill Crew, Inc., was represented by Nicole Killoran, Esq. Post-trial briefing was completed on October 29, 2015.

## The Claims

Plaintiff brings this action in connection with the alleged failure of Defendant to pay on a promissory note that it executed in connection with the sale from Plaintiff to Defendant of forty acres of land in Northfield (the "Property"). Plaintiff also seeks to foreclose on a mortgage that was executed between the parties to secure repayment of the note. Defendant admits that it did not pay Plaintiff regarding the note but raises counterclaims wherein it asserts that Plaintiff's omissions in connection with the sale violated Vermont's consumer fraud law, 9 V.S.A. § 2453, and that Plaintiff committed timber trespass by building a road and logging the Property without Defendant's permission.

After consideration of the evidence, the Court makes the following determinations.

Findings of Fact

Plaintiff listed the Property for sale with a realtor in 2010.  Defendant expressed interest in the Property.  Defendant hoped to log the Property, use it for gatherings, and/or sell it for a profit.

The parties agreed upon a purchase price of $57,000 for the Property.  The parties then negotiated the terms of the sale.  Plaintiff accepted a down payment of $26,000 and agreed to finance the remaining $31,000 himself for a ten-year term at six percent interest per annum.  Defendants gave Plaintiff a note and a mortgage on the property in connection with the financing.  *See* Exhibits 1, 3 & 5

The Property was also subject to a tax lien and to lien from the Office of Child Support (OCS) due to Plaintiff's past failure to pay in full certain child support obligations.  To reduce or eliminate those liens, as part of the financing arrangement, Defendant agreed to make its monthly mortgage payments in equal amounts to the Vermont Tax Department and to the OCS.  *See* Exhibits 1 & 5.  The agreement between the parties provided that, if the monies paid by Defendant pursuant to the note were insufficient to discharge those liens, Plaintiff would remain liable for the liens and Defendant could place liens on Plaintiff's other properties to secure payment of those obligations.  Exhibit 1, ¶¶2-3.

Neither side presented any evidence as to the precise amounts of the above liens and obligations.  Plaintiff testified that, as of the time of trial, both liens and the child support obligation had been discharged.

2

Defendant began making payments on the note in the fall of 2011. Defendant soon discovered that Plaintiff also had another unfulfilled child support obligation with the OCS. Though not reduced to a lien on the Property, the OCS informed Defendant that it could not direct the mortgage payments only to one of Plaintiff's obligations. Instead, it would split the mortgage payment between those two obligations.

Defendant made a few payments on the note, but ceased paying in January 2012. Though there was some dispute as to the precise amounts paid, the Court adopts the amounts set out in Exhibits 8-9. Those Exhibits establish that Defendant paid only $1,548.72 towards the loan.

In or about July 2012, Steve White was the Defendant's President. He reached out Plaintiff to discuss the situation. White told Plaintiff that Defendant's membership had declined significantly and that it could no longer make payments on the note. The parties discussed the concept of re-conveying the Property back to Plaintiff, with Plaintiff possibly returning some of the down payment.

Plaintiff testified that he also discussed with White whether he could do some logging on the Property. He indicated that he needed firewood for the upcoming season. Given that the Defendant could not make payments on the note and wanted to re-convey the Property, he proposed that he would log the land and give Defendants credit for the timber when they worked out the terms of the re-conveyance. Plaintiff stated that he had a friend who could loan him some equipment to make a road to allow the logging operation.

Plaintiff averred that White agreed to let him log the Property on those terms. While White testified that he did not recall a discussion of logging during their conversation, the Court credits Plaintiff's testimony in that regard. Given the financial situation faced by Defendant, the Court believes it especially likely that White would have agreed to allow one of Defendant's significant creditors such an accommodation. In addition, having observed Plaintiff's demeanor, the Court does not believe it likely that he would have gone to the expense and effort to construct a road and log the Property unless he had been given consent by White.

Plaintiff then proceeded to log the Property. He borrowed equipment and improved what was an old skidder trail that had been on the Property.

In the fall of 2012, Defendant's Treasurer, Tom Pope, called Plaintiff to discuss the Property and Defendant's inability to pay on the note. Plaintiff told him that the Property had a connection to his family and that he would be interested in a re-conveyance. Plaintiff indicated that they could discuss the precise arrangements and complete the deal in the following year. He told Pope that any missed payments could be added into the back end of the deal that would result in a re-conveyance of the Property to Plaintiff. The parties did not discuss the logging operation.

The evidence is not clear as to why, but neither side appears to have followed up on the idea of resale of the Property back to Plaintiff.

In the summer of 2013, Pope heard that someone was living on the Property. He investigated and found the logging road and a camp site. There was a trailer, a grill, and debris from a logging operation. Pope left and returned two days later

4

with a camera.   At that point, the trailer was gone, but he took photographs of the Property.  *See* Exhibit A.  Plaintiff credibly testified that he was not on the Property at that point, that he does not own a trailer, and that he does not know who was using the Property.   The Defendant has not provided sufficient evidence for the Court to conclude that Plaintiff was using the Property at that juncture.

Following the summer of 2013, relations soured between the parties. Defendant claimed that it had not given permission for the logging operation and that Plaintiff owed Defendant money for the stolen trees and for the damage to the land caused by Plaintiff's poorly built logging road.  Plaintiff claimed that he had permission to log, that Defendant had not paid him what it owed under the note, and that Defendant owed him money for the increased value of the land due to the construction of the road.

The parties dispute exactly how many trees Plaintiff cut on the Property. Plaintiff admits that he cut approximately thirty-six trees that translated into ten cords of firewood.  His experts support that conclusion.  Experts from both sides agreed that one can identify whether two trees were cut by the same person by examining the cut marks on the trees.  Based on that concept, Defendant's expert identified an additional thirty-six trees that were cut on the Property at about the same time by the same person.  In total, Defendant's expert opined that Plaintiff removed fifty-five cords of wood in addition to significant amounts of other mill-quality wood.  The Court credits Defendant's expert regarding the number of trees that were cut, but not as to the amount of resulting timber.  Taking all of the

evidence, the Court believes the most likely scenario is that Plaintiff cut seventy-two trees and that those trees yielded twenty cords of firewood.

Analysis

1.      Plaintiff's Claim for Breach and Foreclosure

Based on the above Findings, Plaintiff has established his claim for breach of the note. Defendant has not made payments on the note since January 2012. Deducting the payments made by Defendant, $1,548.72, Defendant now owes $29,451.28, plus interest at the rate of six percent. Based on the failure to pay on the note, Plaintiff is also entitled to foreclosure of the accompanying mortgage. Absent agreement of the parties, the Court orders that a judicial sale shall be held. Plaintiff has also asked for a shortened redemption period. He persuasively testified that he has been forced to pay $4,000.00 in taxes for the Property, s*ee* Exhibit 10, and that he may not be able to make such a payment again if there is a lengthy delay. The Court agrees and establishes a redemption period of thirty days from the date of this Order.

2.      Counterclaim:  Consumer Fraud Act

Defendant asserts that Plaintiff's failure to inform it that he was subject to two child support obligations amounts to a violation of Vermont's Consumer Fraud Act (CFA). Defendant, through its then-President Robert Thompson, claims that it

would not have entered the deal had it known of those dual obligations. For a number of reasons, the Court finds in favor of Plaintiff as to this claim.

First, the Court does not believe that the agreement in this case can be considered "in commerce," under the CFA. *Sawyer v. Robson,* 2006 VT 136, ¶ 11, 181 Vt. 216, 222-23. As discussed in *Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, ¶¶ 19-25, 195 Vt. 524, 534-38, the CFA is designed to police the "consumer marketplace." It not intended to address purely private agreements made between parties. *Id.*

The agreements here have elements of both a private transaction and a deal entered into through a public market. The land was offered to the general public through a realtor. From that point on, however, the negotiations and resulting deal between the parties were highly particularized. The agreement, note, and mortgage were plainly the result of an arms-length back and forth between the parties. Most importantly, Plaintiff agreed to accommodate Defendants by financing the sale himself, and Defendants agreed to make mortgage payments directly to governmental entities on Plaintiff's behalf. Specific terms were negotiated concerning what would happen if the liens were not discharged during the life of the note. On balance, the Court concludes that the transaction in this case is best viewed as a private contract not subject to the CFA.

The fact that the CFA contains specific references to real estate transactions does not alter that conclusion. While Sections 9 V.S.A. §§ 2451a(b) and 2453(e) make plain that the CFA can apply to real estate transactions, the Court cannot conclude that those provisions mean that the CFA applies to all real estate

7

transactions. Instead, there must still be a finding that the particular real estate deal at issue was "in commerce" as that term is used in the CFA.

Second, even if that were not true, the Court does not believe Defendant has established that the term at issue here was material to the transaction. There was no evidence at trial that either side was aware that the OCS had a policy whereby it would apply any monies paid on behalf of a parent to all of that parent's outstanding obligations -- regardless of whether they were secured by a lien. Nor was there any evidence of the precise amount of the OCS lien or the second child support obligation at issue. Such evidence is vital to assess whether the existence of the second obligation was material and significant. Here, the evidence shows that, even without Defendant's mortgage payments, both the lien and the second child support obligation had been extinguished by the time of trial. The only inference to be drawn from that conclusion is that the second obligation was not large.

In the absence of specific evidence as to the amount of those obligations, the Court also cannot find credible the assertion that the deal would not have happened had Defendant known that there was a secondary child support obligation of some unspecified amount. That conclusion is reinforced by the fact that the agreement between the parties contemplated the possibility that the child support obligation might continue to exist even after Defendant completed all of its payments on the note. The agreement provided that Plaintiff would still be liable for the OCS lien and gave Defendant a remedy against Plaintiff's other property. Exhibit 1. The existence of that provision is further evidence weighing against Defendant's claim

8

that it would not have entered the deal if it had known that a portion of its payments would have been diverted to another, potentially minor, child support obligation for some unspecified and, potentially brief, period of time.[1]

3.     Counterclaim: Trespass and Timber Trespass

Though Vermont cases have gone both ways on the issue, the Court believes that Plaintiff, as Counterclaim Defendant, has the burden of establishing that he had permission to perform the logging operation. *Compare Town of Wolcott v. Behrend*, 147 Vt. 453, 457-58 (1986) (plaintiff need only prove trees were cut on her land) *with Davis v. Cotey*, 70 Vt. 120, 120 (1897) (plaintiff must prove lack of consent).   As many decisions have noted, the timber trespass statute merely provides a damage enhancement for what was always actionable at common law. *See, e.g., Alvarez v. Katz*, 2015 VT 86, ¶ 22.  At common law, a person who is on the land of another and argues that he has permission to be there bears the burden of establishing that consent.  *See* Restatement (Second) of Torts § 167(c) (1965)

Here, as determined above, the Court concludes that Plaintiff has carried his burden of proving that he had permission from White to build the road and remove trees from the Property for firewood.  Though there was no express limitation on the number of trees that Plaintiff could have taken, the focus of the conversation was on the upcoming heating season.  In the Court's view, the most likely scenario is that White gave Plaintiff permission to create the road and harvest sufficient wood for the upcoming winter season.  Plaintiff concedes that he took ten cords of wood for

---

[1] Of course, the fact that the payments were divided between two child support obligations would not have changed the amount ultimately owed by Defendant in connection with the note and mortgage.

9

that purpose. The creation of the road, the cutting of thirty-six trees, and the removal of ten cords of wood does not amount to timber trespass.

The Court reaches the opposite conclusion with regard to the cutting of the additional thirty-six trees that the Court has concluded were also cut on the Property. Based on Plaintiff's testimony, the parties' discussion was concerning wood for the upcoming winter season. The Court believes Plaintiff cut more wood than needed for that purpose and that Plaintiff cannot establish that he had express permission to harvest the additional timber.

The Court also believes, however, that Plaintiff was under the mistaken, but honestly held belief, that he had a legal right to take the additional trees. To the extent the Court can tease evidence from the very brief conversation between the parties: the conversation took place at a time when Defendant was not paying on the note and was indicating that it could not make payments in the future, both parties were focused on the likely re-conveyance of the Property to Plaintiff, White was amenable to allowing logging on the Property, both agreed they would account for the trees as part of the re-conveyance, no express limit was set on the number of trees that could be taken, and the general impression given by White was that Plaintiff's logging of the Property was acceptable to the Defendant. In light of those determinations, the Court concludes that Plaintiff "had good reason to believe . . . that he . . . had a legal right to perform the acts complained of." 13 V.S.A. §

10

3606. As a result, Plaintiff is liable only for single damages for the additional thirty-six trees harvested.[2] *Id*.

     5.     <u>The Affirmative Defenses & Calculation of Damages</u>

Defendant has raised a number of affirmative defenses, most of which are equitable in nature and concern appropriate compensation for the trees that were logged and purported damage to the Property from the construction of the road.

The Court has concluded that the parties had an oral agreement that allowed Plaintiff to build a road and log the Property, with the understanding that Defendant would receive credit against its debt for the value of the logs. Given that conclusion, Defendants are not entitled to any offset concerning any alleged damage caused by the road.

Moreover, even if the Court considered the issue as a factual matter, the Court does not believe Defendant has submitted sufficient evidence for the Court to conclude that the road had caused "damage" to the property. Defendant provided expert testimony from Paul Corey, an experienced logger. He opined that, absent spending significant sums on the road, it would become unusable in five years. He provided various estimates that he testified were his best "guess" as to what it might cost to make improvements to the road.

---

[2] Section 3606 allows single "damages" if a person engages in a timber trespass based on a reasonable mistake. Otherwise, the plaintiff in such a case is entitled either treble damages or the amount that would have been assessed as a penalty under Section 3602, whichever is greater. Based on the specific language of the statute, the Court concludes that Defendant in this case does not have the option of seeking a civil penalty, as opposed to single damages, for the timber trespass established in this case.

While Corey stated that he thought the road had either no or a negative current value, he did not express any opinion as to any precise diminution in value of the Property as a result of the road. In addition, his opinion that the road has no or a negative value is inconsistent with his testimony that the road could have a useful life of five years. During that period, the road could be used for logging, which is one of Defendant's intended uses of the Property. Indeed, Plaintiff testified that the road had added to the value of the Property. Without actual evidence that the construction of the road diminished the value of the Property, the Court is unwilling to speculate about such an impact, especially in light of the obvious uses to which the road has been and still could be put, at least in the short term. Defendant has not established that it should receive any offset for any purported damage caused by the road.

There remains the issue of determining the value to be attributed to the timber that was rightfully taken by Plaintiff.[3] Per the terms of the parties' agreement, Plaintiff was to cut trees on the Property for firewood. He was then to give some amount of financial credit to the Defendant for the wood. While Defendant suggests it should receive the mill value of the logs, there is no indication that Plaintiff took any of the trees to a saw mill. Nor was that part of the discussion with White. Under such circumstances, the proper focus is the value of the timber as firewood.

_____

[3] Whether viewed as enforcing the terms of the parties' oral agreement or a claim for set off or unjust enrichment, the result would be the same.

12

Defendant has argued that the firewood should be valued at $240.00 per cord, which is the price one might pay for a cord delivered to a home. But, as Plaintiff and his experts stated, that figure takes no account of the time and effort needed to cut, split, and haul firewood. Plaintiff's logging experts, Tom Lincoln and Casey Elmer, opined that loggers typically pay only as much as $15.00 per cord for standing trees. The Court adopts that figure as fair. At $15.00 per cord, Defendant is entitled to an offset of $150.00 on the amounts owed on the note and mortgage in connection with the wood that he had permission to take.

With regard to the additional thirty-six trees that were taken, Corey has not identified with precision which of the trees in his calculation falls within the group of thirty-six trees that Plaintiff had permission to cut and which do not. Also, Corey contends that Defendant should be awarded full veneer value for the many of the trees taken. The Court is not persuaded that such an approach is appropriate. Plaintiff's experts persuasively testified that ascribing veneer value to many of the trees taken does not provide a realistic market value. Logging expert Lincoln credibly testified that only roughly three percent of logs at issue were of veneer quality. Lastly, the Court has already concluded that Corey's opinion as to the amount of wood taken from the Property is overstated. Accordingly, Defendant's damage figures are not sufficiently linked to the thirty-six trees that the Court has determined were improperly taken and, in any event, do not provide a true and accurate estimation of fair market value.

In the Court's view, the best estimate of the amount of wood that was improperly taken from the Property is an additional ten cords. The Court adopts

Plaintiff's and his expert's testimony as to the initial thirty-six trees and their yield of ten cords. There was no credible testimony establishing, and the Court has no way of determining, that the additional thirty-six trees cut in the same area at the same time would have yielded significantly more wood.

Given that Plaintiff did not have actual permission to take the additional timber, the Court does not deem it appropriate to take account of Plaintiff's costs and efforts when assessing damages as to those trees. Based on that approach, Defendant is entitled to damages of $2,400.00, *i.e.*, ten cords at $240.00 per cord.[4]

4.      Plaintiff's Additional Damages

Plaintiff has sought additional damages from Defendant to recover the costs he incurred in constructing the logging road. His Complaint, however, sounds only in foreclosure and provides no basis for the Court to award such damages. In addition, the Court concludes that the verbal arrangement between the Plaintiff and White did not provide for any credit or repayment to be made to Plaintiff for the costs of constructing the road. Plaintiff agreed to construct the road on his own dime in order to access and remove the lumber. As a result, even if he had pled some actionable theory, he is not entitled to recover the costs of constructing the road.

5.      Attorney's Fees

---

[4] Defendant offered evidence that the logging operation left debris on the Property, including tree tops, branches, oil cans, and garbage. Even assuming those were abandoned by Plaintiff, Defendant provided no evidence of the cost to clean up the mess and no evidence that the presence of such materials would have any impact on the value of the Property.

The mortgage and note provide that Plaintiff shall be entitled to the reasonable attorney's fees he incurs in enforcing his rights under those agreements.[5]  Plaintiff seeks such fees in this case.

As Defendant rightfully points out, however, an award of attorney's fees is still a matter within the Court's discretion.  *Retrovest Associates, Inc. v. Bryant*, 153 Vt. 493, 501, 573 A.2d 281 (1990) (citing 12 V.S.A. § 4527)).  In this case, the foreclosure action was fairly straightforward.   Plaintiff rested his case after one brief witness and the submission of a set of exhibits.  The lion's share of counsel's pre-trial efforts was likely spent investigating and preparing to address the Counterclaims.  While Plaintiff succeeded in defending some of those claims, Defendant prevailed on one of its Counterclaims.  Further, there is a serious question as to whether Plaintiff is even entitled to fees for time spent in defending against counterclaims.  *See Wells Fargo Bank N.A. v. Sinnott*, No. 2:07-CV-169, 2010 WL 297830, at *4 & *8 (D. Vt. Jan. 19, 2010) (noting that Vermont has not ruled on the issue, which has divided courts in other states).

Given all of the competing considerations in this case, the Court cannot conclude that all of the fees incurred by Plaintiff should be shifted to the Defendant. In the absence of agreement between the parties on an appropriate figure, the Court will need to make that determination based on the specific billing amounts, the tasks undertaken, and the arguments of the parties.  Such determinations must await further submissions of the parties.

<u>Conclusion</u>

---

[5] The mortgage actually provides for a "solicitor's fee."

15

Based on the foregoing:

1.     Plaintiff is entitled to judgment on its claim for failure to pay on the note and for foreclosure of the mortgage on the Property in the principal amount of $29,451.28 ($31,000.00 less the $1,548.72 in payments made by Defendant), plus interest in the amount of six percent through October 14, 2015, in the amount of $6,552.91; and interest from that date until the date of judgment at six percent in the amount of $145.20 ($4.84 per day).  Absent agreement of the parties, the Property shall be sold pursuant to a judicial sale, and the period of redemption shall be thirty days.  Plaintiff is also entitled to recover the $4,000 in taxes paid by him concerning the Property during the pendency of this proceeding.

2.     Defendant is entitled to a credit of $150.00 in connection with the firewood rightfully taken from the Property.

3.     Plaintiff is entitled to judgment as to Defendant's CFA claim.

4.     Defendant is entitled to judgment on its timber trespass claim in the amount of $2,400.00, which shall be accounted for as an additional credit against the amount Defendant owes on the note and mortgage.

5.     Plaintiff is also entitled to his reasonable attorney's fees, as will be determined by the Court.

6.     Given the circumstances and outcomes of this proceeding, each side shall bear its own costs.

7.     Plaintiff shall submit a proposed order.

Electronically signed on December 01, 2015 at 11:58 AM pursuant to V.R.E.F. 7(d).

16

_____
Timothy B. Tomasi
Superior Court Judge